Good afternoon. May it please the court. I think I was in front of you not too long ago in February or March. It's nice to see everybody again. I represent the plaintiffs in this case, Charles Raymond and Arlene Parks, George, Don, Michael and James Mueller and Ms. Kathy Reason. This is a dispute surrounding a 320 acre farm, the ownership of that farm in Rock Island County. The plaintiffs brought a suit for ejectment and on cross motions for summary judgment, the circuit court found first that the ejectment claim was defective because the plaintiffs did not follow procedures under the Forced Laundry and Detainer Act, and then separately held in favor of the defendants entering summary judgment on the ground of latches. And in the time that I have today, since it's short, I wanted to focus the comments and my argument on the latches issue. I think that's kind of become the focal point in the briefing. It was certainly one of the primary grounds of the judge's ruling, so I was going to start there. Latches assumes really that the case was timely brought. There hasn't been any argument that this was brought outside the statute of limitations. So under latches, we're talking about a situation where the court is going to bar a claim short of statute of limitations based on both a combination of delay and some inequity, some inequity in the case. And that's really the focal point of the analysis is whether there's inequity. And the Supreme Court has laid out a four-part test in the Pyle case, goes back a long ways. And when you look at the test, I'm not going to enumerate the factors for you, but basically what the test is looking at is you're weighing the parties' conduct. And one of the things that you're really looking for is what is the source of the problem? Where did the problem come from? Is that attributable to somebody's conduct in the course of these events? Why are we here? Who created the situation? And so the first part of the test asks you to look at the conduct by the defendant who's raised the latches defense. And so it's a very fact-intensive inquiry, and so I want to focus a little bit on the facts. I usually like to argue the law up here, but this is a fact-intensive case, and so I'm going to talk a little bit about the facts. And when we talk about the conduct by the defendant, the starting point here is Will Jr.'s execution of a quitclaim deed in his favor, knowing that he had no deed from Laura, his mother. Now, there's only three reasons why Will Jr. would have executed that quitclaim deed. Either he never paid for the property under the contract for sale, and so he deeded it to himself, or he lost the deed, so he deeded it to himself, or he had the deed and he just didn't report it. Those are the only three possibilities I could come up with, but the fact of the matter is he created a quitclaim deed to himself and then moved it into a trust, and what that smacks of is covering up a problem. That's concealing a problem, because it could only be one of those three things. Either he didn't pay for it, he lost the deed, or he had the deed and didn't record it. So why does he quitclaim the property to his trust? Could it have been second and third scenarios of a big problem? No, he could have fixed them, no question about it, which is why it's so peculiar that he quitclaims the property to himself. And there's a little bit more concealment to this, because he puts the deed in trust, and the effect of putting it in trust now is that the deed can be transferred without anybody knowing outside probate. And so what happens next? Okay, so that's a little bit further, I don't want to call it concealment or deception, but it's going to throw you off the scent, okay? It's going to eliminate suspicion. Now, Will Jr. dies in 2002. There's no probate of his will. His will is not probate. Instead, what happens is Will Jr.'s son, James C., who's been living on the farm with Will Jr., gets together with James D., the grandnephew, and says, Look, Will Jr.'s trust says the property of the farm goes to you. What do you want to do? And now the two of them agree that what they're going to do is, they're not going to give a deed immediately to James D. Instead, they agree that James C. is going to continue to live on his father's property, run the farm, pay the taxes, pay the insurance, and again, what's happening here? It's, again, I don't want to use the word concealing, but it's keeping all this on the lowdown and making sure that everything looks like nothing's really changed. Nothing that would arouse suspicion or make anybody wonder what's happening with the farm because there's no transfer of a deed until 2005. 2005, finally, three years after Will Jr.'s death, is when the trustee's deed is issued to James D. Now, that is recorded, okay? No question about that, that that deed does get recorded in January of 2005. But then what happens next? In 2011, James C. dies, okay? December of 2011, James C. dies. Now, there is a probate estate open for James C. He didn't have a trust, so there's a probate estate open, and now notice goes out. And what do we find out from the notice? The notice, there's an inventory, and the inventory lists the property, the farm, 320-acre farm is belonging to James C., even though the trustee's deed was issued to James D. Well, my clients get notice because they are the heirs and legatees of Laurel, the original owner of the farm. They are, in many cases, the brother and sister at that time, brothers and sister at that time, of Will Jr., the man who was living on the farm and who deeded the property to himself and then through the trust deeded it to his grandnephew. And that's when they first find out that, wait a minute, what's happening with the farm? What's happening with the farm? First, it's in James C.'s estate. All of a sudden, the estate inventory is changed, and now the farm is not in James C.'s inventory of his estate anymore. And instead, they find out that James D. is getting the property. So instead, if he had died under the intestate succession rules, this farm would have gone from Will Jr. or from James C. If it had been owned by James C. under intestate succession, it would have passed to my clients. When should your clients have known about the property? That's the key point, is right then and there. That is when they did know. I'm asking when they should have known. Okay. I don't think that there is any reason that they should have known any sooner than when they received that notice of James C.'s probate estate in December of 2011, and they did file their suit immediately within a month thereafter. But the reason why I say they shouldn't have known any sooner is because let's go back now and talk about some more of the facts and the history. What do they know? In 1960, they know from Laura, the mother, the owner of the property, that she and her husband, Will Sr., are going to sell the property to Will Jr. They don't know the terms of the contract for sale. They don't even really know that it is a contract for sale. They just know that Will and Laura Sr. are going to go ahead and sell the property to their brother, Will Jr. That's all they know. Nobody has ever seen the contract. Now, the defendants contend that that should have prompted some inquiry on their part later when Laura died as to what happened to the farm, but actually the inference in that is the reverse. I mean, if you think about it, if you're a family member and you know that one of your siblings has been sold or given the farm by your parents and as far as everything appears, he's been running the farm, the will that you've gotten says that he's been disinherited because your parents have already benefited him, why would you suspect that your brother didn't pay for the property? Why would you have any suspicion whatsoever? Why would you even go to the property records to go and look and see if there's been any deed for this farm? You're not dealing in the property. For all intents and purposes, it appears as if the transaction was completed and as I went through all the things that Will Jr. did in terms of the quick claim plea, setting up the trust, how he deeded it on to James D., all of that has done everything possible to squelch any suspicion, to throw them off the set, so there would be no reason to suspect any of this. But just because the deed didn't transfer doesn't necessarily mean that the terms weren't completed, does it? No, that's true. It does not necessarily mean that. We don't know. I agree. We don't know. But what we do know for sure is that he took a step that was questionable. It's questionable, and that's why we're talking about the equities here. Who has engaged in conduct that has created the situation and that smacks of some deception or some concealment? Again, I don't use those terms in that negative pejorative sense, but it's that idea of not arousing suspicion, keeping things off the radar, making sure that people have no reason to inquire. That's what's happening here, and when you move. You're speculating. Oh. That's total speculation. Oh, I don't think that that's speculative to say that when you create a quitclaim deed to yourself in the absence of any deed to you in the chain of title, that's a fact. And when you transfer it to a trust, that that now shields that from public view as to how that property moves around, that's not speculation. That's a fact. Speculation is the reason why that was done. That's true. In your speculation. I agree, but the reason really doesn't matter. What really matters here is would this arouse suspicion in the people who are the true heirs? And the point is that all these steps looked at objectively without regard to the reason. The point is that it conceals what's really happening. It shields from plain view what's happening. It discourages suspicion and investigation. And your question was when should they have known? I don't think they did. They had any reason to know or suspect or investigate until they got the notice of the probate of the estate of James C., the son, who died with a will. That's the point in time. And they acted within a month of learning that. They filed this suit for ejectment. And there's no question that they have their title. I mean, when you look at the chain of title, the presumption is they do have title. There is no deed in the chain from Laura to Will Jr. She died. That property vested immediately in my clients. So from the standpoint of who has paramount title, there's no question raised here at all that my clients have paramount title on the record. Now, the other thing that the cases that deal with this question of latches talk about is notice. And that's discussed a lot in briefs, what's in record books, the recorder's office, the public records. And the argument here is, well, my clients should have seen the gap in title. They should have seen that Laura had never deeded the property to Will Jr. and that Will Jr. created this quick-play deed to himself in 1993. Well, they weren't dealing with the property at the time. As far as they knew, Will Jr. did own the property. They had no reason to consult the record. Now, compare that conduct to James D., who did get the trustee's deed. He's dealing with the property. He is the one who is renting it out through James C. He is the one who is having James C. pay insurance, pay property taxes, and so forth. He's dealing with the property. If there's anybody who should be on notice of what the public records show and whether he has good title or not as the successor under this trust, it's James D. So this question of public notice and the argument that the defendants make that somehow we should have been on notice, it cuts the other way. There's a case called Purdy. I think it's a second district case, which is very close to that situation. It's a tenant farmer, goes ahead, enters into a deal with the owner of the farm, makes all sorts of arrangements, but he's on notice by the public records people because he's dealing with the farmer on all of this, but the bank has an interest, a deed in trust on that property, and then he has to end up turning over all the bushels of corn and the profits to the bank. He said, well, wait a minute, you know, latches, latches, and the court said no. There's no latches here. You were dealing in this. You should have been on notice because you were involved in the transaction, so you would be on notice. My clients aren't involved in any of these transactions. There's no reason for them to be consulting the public record about what happened with the deed. Counsel has two minutes. You know, one of the other points that the fourth factor is the question of prejudice, prejudice to the defendant, but again, we're balancing the equities here, so what's equitable, all right? James D., the only thing that he's out if he loses this case is one taxpayer. He made only one tax payment. All the other tax payments were made by James C. out of an estate, or I'm sorry, out of the Will Jr. Trust account. He didn't pay the money himself until the very end after James C. died. One tax payment, and he was about $3,200. One of my clients suffers prejudice if they lose this case. The heirs and legatees of Laura, who are the ones with superior title, lose the 320-acre farm. So when you're looking at the question of latches here and you're trying to balance the equities of what happened, where is the deceptive conduct, the action that threw people off, that led people not to investigate? My clients are inert. They're not doing anything because they don't know anything. They're not dealing with the property. They have no reason to investigate it. They trusted that their brother paid off their parents when he bought the property. There was nothing to arouse suspicion that he had not. You said there was no record of the contract or anything, but weren't there some records that the mortgage was paid off? Twenty-nine months early, yes. And there was other payments that he had made to his mother, and she had notes of those. Well, the notes are not really authenticated. But, yes, the contract does have handwritten notes on it that show payments up through the year 1977. So you do have the contract? We did it before. No, we got it in this case. It was produced by the defendants. We didn't have it. This was produced by the defendants in response to a bill of particulars that was filed at the outset of the case. We did not have the contract. Now, I don't know how they got the contract. We don't have the answer to that. But it's true. The sale price was $60,000. There was a $17,000 mortgage that the parents took out to buy the new home in Aledo, where they moved to, and Will Jr. was responsible to pay that off and then to pay them another $43,000. He paid off the mortgage, no question about that. That's in the record. And there's these handwritten notes that indicate that some payments were made. The notes stop at 1977. There's no way to know if there were payments made after that or not. And you're saying those were not in Lawrence's papers? We don't know where they came from. All I can tell you is that that document was produced in response to the bill of particulars we filed at the outset of the case when they raised the defense of adverse possession. And that's when it was first sought. Thank you, Mr. Benson. Thank you, Mr. Benson. We're going to time for a vote. Mr. Milne. May it please the Court, good afternoon. I'm here today along with my partner, Daniel Harden, on behalf of Jim Parks, who in this case is referred to as J.D. Parks to differentiate him from J.C. Parks and so on. Jim Parks and his father, John Parks, they are the defendants. And as you know, this is a dispute over the ownership of what's called the Parks Farm. It's been in the Parks family for many, many decades. It's in Rock Island County. And this case has been pending for almost six and a half years. It involves many legal issues and it involves things that cannot be determined due to the passage of time. But the following things are very clear. One is that Will Sr. and Laura wanted their son, Will Jr., to have the Parks Farm. And second, Will Jr. wanted his great nephew, J.D. Parks, who is the only Parks still farming, to have the Parks Farm. And that is how the family treated this situation for many years, 50 years actually. Farming, Will Jr. was farming. He raised his family there. The plaintiffs or their predecessors entitled lived in the vicinity. They went by the farm all the time. Everybody was aware that Will Jr. was operating this farm over these years. Then in January 2012, out of the blue comes a lawsuit by some relatives claiming and seeking to oust J.D. from this farm and to obtain ownership based on the failure to record a deed, a deed from Will Jr. or to Will Jr. from his parents. Our judicial system seeks to do justice and achieve fair results. We have equity, and specifically we have in our system latches, doctrinal latches. There are several issues that are set forth in our brief, and in the short time that I have here today I want to try to discuss a few of those, and I'll start with latches. I'd like to talk about the statute of limitations because contrary to what counsel just told you, it is our position that the statute of limitations has expired before this lawsuit was filed. I'll talk about their rejectment, why their rejectment case fails. Latches, as we all know, is an equitable doctrine as far as a lawsuit when a plaintiff unreasonably delays filing that suit to the prejudice of the defendant. There are many cases that have defined that term, including the Sully case that's set forth on page 16 of our brief. And that was the basis for the decision of the trial court in this case. That is why it granted our motion for summary judgment and denied the motion filed by the plaintiffs. Will Jr. operated this farm as a contract purchaser since the 1960s. His mother, Laura, died in 1989, and there is no evidence that she ever disputed Will Jr.'s right to occupy the farm or operate the farm. The plaintiffs did not assert this claim, the claim they're now making, when Laura died in 1989. They didn't assert this claim at any time prior to 1991, which is when Laura's probate estate was closed. Instead, they filed suit more than 20 years later, some 23 years later, as a matter of fact, in 2012. As the trial judge stated, by that time, the persons with knowledge to what went on here, Laura, Will Jr., his son J.C. Parks, were all dead. The documents, attorney's records, specifically the estate planning file, Laura's estate planning file with the lawyer Shoemaker, Dwight Shoemaker and Alito, had been destroyed. And why wouldn't it have been? I mean, this is so far after the fact. This delay prevented J.D. from producing evidence. And this delay occurred despite the fact that the plaintiffs or their predecessors were on notice of their claim. Laura had four sons. One died when he was 14 years old. So she had three surviving sons. She wrote letters to two of them. She wrote letters to Robert and to John D. Parks. And she told them specifically that she and her husband, Will Sr., were going to sell the farm to Will Jr. And that she told him the price. And she said, I'm going to take his share of the estate. Instead of him inheriting through the will, I'm going to let him have a discount for some portion of the price. Because that's the way he's going to be taken care of upon my death. She dug all that out and she advised them of that. And her daughter, Anna, also was aware that that was what happened. And that was established when we took George Miller's deposition, who was one of Anna's sons. He said, yes, my mother knew about the contract sale by Will Sr. and Laura to Will Jr. Nevertheless, none of them, nor Laura's executor, who was acting as representative of the beneficiaries, did anything. And the plaintiffs are thus barred by the activities, or the inactivities in this case, of their executor. J.D., and that's set forth in a third district case, the Granville National Bank case. It's on page 21 of our brief. J.D. was prejudiced in a number of ways. And they're set forth in our brief, but specifically, most importantly, by the lack of any evidence by the time this lawsuit was legally filed in 2012. That's the essence of latches, and thus this court should affirm. Mr. Knight, why would they have known? What would have caused them to look? The letters that were sent to Robert and to John D., telling them that a farm was being sold to Will. The fact that Will was there farming it, planting the crops, harvesting the crops, and so on. They should have had reason when Laura died, the prudent executor, would have checked that to say, well, she sold it to him, did he pay it? Let's do a title search, let's see who's entitled, and let's have some conversation with Will Jr. You know, there was an inference in the argument we just heard that somehow Will did something under the table or very suspicious, hiding things, if you will, by putting something into a trough like this. I think we all know that today, people in estate planning purposes set up troughs all the time, but what's important to answer your question, Justice McKay, we asked them, did you ever, we took all the deposition, we took Kathleen Greeson, the executor, we took the various relatives, and we said, did any of you ask Will if he paid for the farm or what the status was? None of them talked to Will. So Will did not mislead anyone, because nobody asked him. Let me just say, I'm not sure this is totally relevant, but on Laura's death, Will Jr. had been disinherited in the sense that they said, we've taken care of Will and his mom, right? Well, they used the word disinherited, it sounds like. Yeah, he didn't get anything under the will. Roughly, what was the size of Laura's estate that the other legacies received? I remember, Justice, I'm sorry, but I think they each got about 20-some thousand dollars at the end, when they all signed receipts saying they received, I think that's the number, approximately. So, I'd like to just discuss very briefly a couple of other points. Statute of limitations. You heard Constance say at the beginning of this argument here today that this was done, this all was within the statute of limitations. Nobody says the statute of limitations has expired. That's not true. Justice, Judge Vander Wille, the trial judge, pointed that out very clearly, and it is a very simple analysis. In other words, they have to take their title, this claim of title, from Laura's death. They say that when she died in 1989, she left a will and it said, the rest and residue of my property goes to these people, these plaintiffs, or their predecessors. So that's 1989. They filed this lawsuit in 2012. The statute says, and that's 735 ILCS 5-13-101, says, you have to bring an action for recovery of lands within 20 years. 20 years is the statute of limitations. This suit was filed 23 years after Laura died. So it's barred, and that's a simple analysis that this court can just simply affirm on that basis and not have to deal with the laches analysis that both Mr. Vincent and myself have spent a lot of your time talking about. But I do think that this case cries out for laches and justice, but the statute of limitations bars their claim also. Also, residue to cot, I'd like to just mention that very briefly in the form of estoppel. They need to prove that Laura owned that farm in 1989 when she died. Her will was probated in Mercer County as case number 89-P-84. That will had only been drawn up about a year and a half to four months before she died. That will never mentions this farm. The only real estate it mentions is her house in Aledo. The inventory was filed. It doesn't mention this farm. The final report and accounting was filed, a very detailed accounting. This farm was never mentioned, and no mention of any contract, any balance due under the contract. Then, each of the plaintiffs, and this gets back to what I've just talked about with Justice Schmidt and Dundago. Each of these plaintiffs or their predecessors signed a receipt. They came in and said, I have received 100% of what I am entitled to under this estate. The order was then entered on February 20, 1991, approving that final report and closing the estate. Under Section 24-2 of the Probate Act, that order is binding on all interested persons who have notice. In this case, the plaintiffs say, well, we want to collaterally attack that order. And they are collaterally attacking the order. They say, well, the farm wasn't dealt with in the probate proceeding. But the problem with that approach is that the order has binding effect as to any matters which could have been raised in the probate proceeding. That's discussed in the Hooks case on page 31 of the brief. Parties who receive notice of probate are thus barred by the probate proceeding, and that's the Pettit case on page 33 of our brief. Now, the trial judge decided, well, I'm going to grant the summary judgment on latches, not on arrest due to conduct, because, well, you can reopen, he thought you could reopen a probate proceeding. But the problem is with that, they did not reopen the probate proceeding. Instead, they elected to file a separate lawsuit, the one that leads to this appeal. And besides, they couldn't reopen the estate because you can only do that for newly discovered assets. As the court discussed in the Moskos estate case, it's on page 36 of our brief, if you know the existence of property before the estate is closed, it's not a newly discovered asset. These plaintiffs all knew about the Parks Farm. They all admitted that they knew there was a Parks Farm and knew where it was. They knew that Laura Will Sr. had owned it. They knew that their son, Will Jr., was living there and farming it. That's not a newly discovered asset. Counsel has two minutes. Thank you. As the court knows, the finality of our probate process is important. You can't have people coming in after they say they got 100% of what they're entitled to, and the court enters an order and then come back 20, some years later, 23 years later, and say, oh, I want this property. I want this property to be paid to me. This court can affirm on any basis supported by the record, and that's conceded by the plaintiffs in their reply brief. That includes residue of account. So, Your Honor, finally, as to the ejectment, in just the minute that I have left, why that fails is that they have a missing link. One of the elements of ejectment is that you have to prove that Laura was in possession of the farm at the time they claimed to inherit it. That would be what she died. The Fairless case, which is on page 38 of our brief, says, quote, plaintiff must make proof of actual possession under a deed or other claim of ownership. And thus, we're allowed to say plaintiff can trace the title back to a grantor who, at the time of the conveyance, was in possession of the land. Well, in this case, it's undisputed that none of these plaintiffs were living on the farm, and it's undisputed that Laura, when she died in 1989, did not live on the farm, but she lived in Alia, Illinois. So on this basis, for all those reasons, we would ask this court to confirm the decision in the trial. Any questions? Thank you. Thank you. Mr. Benson, some rebuttal? I have a few things I'd like to add. I thought you would. First, I have a favor to ask of the court, and that is I'm going to ask you to drill down on some of these old cases, you know, on the Flatches issue, because you really have to look at these. I mean, these cases are hard to read, these early 1900 Supreme Court cases, very dense, but they will illuminate for you what I was talking about before about weighing the equities and looking for who caused the problem. And specifically, I'm talking about go to that Slayton's property case, and you will see that within Slayton's property, they cite a case called McCleary v. Lewis. And McCleary cites three other cases, Schulte v. Herman, Dekroff v. Haydecker. Don't worry about the third one. It's too long to read. But when you read those cases, you're going to see that those involve situations where the person who stepped in to try and claim the deed, as against heirs, like my clients, were the ones who tried to raise Latches against the heirs, and Latches was not applied because those newcomers were the ones who engaged in improper conduct. Two of those cases involve administrators of the estate selling the property to straw purchasers. Things of that nature, okay, look like legitimate transactions. Let me just ask you this. Respond to one point Mr. Noy made, and that was that, okay, when Laura's estate was probated, at that point, what was to stop before that probated estate is settled, somebody from going in and saying, hey, what about the farm? I think there has to be some reason that you would inquire. I mean, think about the public policy that you're articulating if you say that an executor, under these circumstances, where Will Jr. has been disinherited, where Will Jr. has been operating the farm for all these years, where you knew 30 years earlier that your parents had said we plan to sell him the farm and it's going to come out of his inheritance, why would you ask? So now you're going to impose an affirmative duty on the executor to go out and investigate and question your sibling to find out did you make good on the contract or not. I don't think that the law imposes that obligation on an executor. The executor in this case, as you see from her testimony, went out, hired a lawyer, gathered all the papers. The lawyer was in a nursing home at that time, I think suffering from some severe dementia. I think she was 99 years old. There was no evidence in any of the documents, papers, belongings, anything that they collected from Laura to suggest that she still owned the farm. And everything all points to the fact that Will Jr. does own the farm and they have been told that they were selling it to him. Where is the inquiry notice? I mean, think about it from the standpoint of the discovery rule in tort cases. Knowledge of injury and wrongful cause. You can't put your head in the sand. Prompts inquiry. There's no facts here to prompt the inquiry. That's the problem. That's the problem. But I do ask you to look at those cases and see how the equities break because when it's people who have engaged in the sort of conduct that I've talked about, the phony deed that he created, transferring it this way, keeping it under cover, those are the kinds of equities where the court says, no, you don't apply latches here because you have done everything possible to keep people from becoming suspicious. Those are the cases. So I ask you to please drill down and read those cases. The statute of limitations issue. When you read the statute, 13-101, it's 20 years from when you have the right of possession, right of possession to enter and take possession. Keep in mind that the contract here said that Will Jr. could stay on the property and pay for it until 10 years after Nora died. Well, she died a year, actually, the March of the year following her death. She died in 89. The March of the year following her death was March of 1990. Will Jr. had until March of 2000 to pay for that property. He could live there that entire time. Remember, this is a contract with a balloon payment at the end. It's an interest-only contract. So they're perfectly fine allowing that contract. They inherited the same rights from Nora. When they inherited title, they inherited her rights under that contract, and she had the right to let the contract subsist. The long list, the Hepler and Hooven cases, very clear that when you have a vendor who has the option of either declaring a forfeiture and saying, I'm taking the property back and I'm keeping the payments you made so far, you can do that or you can let the contract run. And when you get to the end, if he doesn't make the balloon payment, well, you can sue for the interest you were entitled to during that period, but you can't sue for the balloon payment because you're keeping the property. That's the election remedy. So the time that their cause of action or claim accrued, their right to possession, would have been only when his right to possession ended under the contract. That wasn't until 2000. They brought this suit in 2012. That's more than plenty of time in the 20-year statute here in 13-101. So to suggest that this was outside, why would he be arguing latches if it was outside the statute of limitations? Right? Well, by definition, you would only argue latches if it were inside the paid act. Right. You only need latches if it's inside. Right. But some lawyers have a tendency to argue on the alternative. Judge, if you don't buy this, I'll buy that. I agree. That is true. But in this case, it was well within the limitations period. The fact that Laura has the clause in her will saying, we've done enough for Will Jr. Right. And he understands that it's not because of any hard feelings. And that clause, coupled with the fact that everybody knows that the farm is supposed to be sold to him, isn't that enough to put the executive in notice, better make sure all of the terms of this were actually abided by and that it was all finished out, or at least say, what does this mean? What did you get? Was it fair? To everyone else. Not to him. See, I just don't see that that arouses suspicion. I don't think it's a suspicion, but it is the, you know, we're creating an inventory, we are going to have to value everything that's in the estate. Maybe if she had found the contract among Laura's papers, that argument, then I could see that, I suppose. But that's not the evidence. The evidence in this case is that the contract was in the possession of the defendants. That's where it came from. But you have said all along that everybody in the family knew that there was an agreement to sell this property to him and that he had been operating it. Right, but they have no idea. They don't know what the terms were. They were just told in a letter from their mother, we are planning to take care of Will Jr. now. He's going to get a deal on the property, and, you know, that's how we're taking care of him out of his inheritance. That's it. Who was Will Jr. supposed to pay? Well, first Will Jr. had to pay off the lien on the mortgage. His parents. No. Oh, I'm sorry. After she's dead. Yes. And he's got the ten years. Correct. Who's he supposed to pay? He would have to have petitioned to her heirs to pay them. They would have inherited the title of the property. They would have inherited Laurel's rights under the land contract, and he would have had to go on to them and say, I'm paying for it. And that's another factor. If it wasn't paid off. Correct. That's correct. That's correct. The only other two comments I wanted to make quickly was, under the Probate Act, 24-2 and 24-9, that is a complete conflation of race judicata principles in the Probate Act. The Probate Act is very clear that it only resolves what's in the probate court at that time. And if there's newly discovered stuff later, 24-9 allows you to come in and litigate that afterwards. So there's no race judicata here. The Fairless case that counsel cited. Counsel. We're done? All good things must end. Okay. And Mr. Vincent, thank you. Mr. Miller, thank you for your arguments here today. This matter will be taken under advisement. A written disposition will be issued.